Oral argument not to exceed 15 minutes per side. Mr. Deimert for the appellant. Good morning your honors. May it please the court my name is Joe Deimert. I am here on behalf of the appellant Barbara Ramsey. I bring you greetings from the North Coast, which still has some residual ice on Lake Erie. And it snowed last week. But our Cleveland Cavaliers are hot. They dismissed the First Circuit last week and we're hoping to do the same against the Seventh Circuit next week or so. That being said, your honor, I represent. I hope you do this well in court this morning. So do I, your honor. The case before you is a diversity case involving a lifeline, Barbara Ramsey, who is the widow of a Cleveland firefighter, John Ramsey. Yet an unfortunate death in his mid-forties, leaving his wife Barbara and four young children to survive that. As a Cleveland firefighter during his early years, he had developed colitis since 1984. It was always part of his life to deal with that. In fact, he had his colon taken out in the mid-eighties as a result of that disease. As time goes on, he performed well as a Cleveland firefighter and on his days off he was a roofer. And during that time period, he had always had life insurance because of his growing family. During 2007-2008, Cleveland had a cutback on the number of firefighters and police and they were also laying off firefighters for miscellaneous reasons. John was unemployed. He let his life insurance lapse. However, when he regained his employment and was given some back pay in 2009 and 2010, his wife and he decided it was time to reinstate life insurance. And that's how this case started. In 2010, he made a... Did the insurance lapse? Was that with Penn Mutual also? No, it was not. It was a different company. During the time period of 2010, when he made an application for new insurance, he applied for a $2 million group coverage and was approved for $2 million by Penn Mutual. He decided during the process to reduce that to $500,000 term and $400,000 whole life. $400,000 whole life is a plan for retirement. It was like a savings account that he would be able to draw upon as his children got older and through with high school and into college. During that time period of the review by Penn Mutual, after he signed his application in February of 2010, they spent over four months investigating his medical condition of colitis. This was a concern because their own underwriting privileges and death prescriptions indicated what the side effects and complications were from chronic colitis. And he had those. During the time period that the review process was going on, he signed a waiver so that they could obtain all medical records, investigate everything that they wanted to investigate from his medical doctors and all providers of medical care during that whole time period. It was after the policy was delivered to him in June of 2010 and he had paid premiums, the policy was delivered, the amendments to a certain question on the application had been made by Penn Mutual. They indicated as a result of a review by their medical director and his condition of colitis, they had to rate him differently, which meant higher premiums. And that's why he cut the coverage in half. The higher premiums based upon his condition, based upon they said a review of a medical director, turned out not to be true. A medical director did not review this. No one really investigated thoroughly all of his symptoms. They never asked him any questions relating to his symptoms. And he totally fessed up about every one of his conditions. He said he fessed up, but he ended up in the response to question 2E. On the questionnaire he said, I have not had a colonoscopy since 2004 and have had no gastrointestinal problems since that time. In the context of everything that was going on, how could that response be full, complete, and true as required by the terms of the policy? What makes it a full, complete, comprehensive answer to the question on the policy? Yes, Your Honor, if I may address that. That's paragraph 2E in the questionnaire. This is a lengthy questionnaire taken by an agent or a nurse on behalf of Penn Mutual. They asked the questions, he gave the answers. And in response to the question, have you ever had any kind of, or treated for intestinal bleeding, ulcers, hernia, colitis, he said, answer, 1984, I had colitis of the colon, intestinal resection, I was hospitalized four days, full recovery in six months. My doctor is Ian Lavery. I last saw him in 2006. Biopsy was taken, normal findings. Nothing in there is untrue, except the date was wrong. Now because of that answer, due diligence by Penn Mutual went to a certain extent, but it did not go all the way. But in the due diligence they found out, in fact, he had seen Dr. Lavery in 2004, not 2006. And he had what Penn Mutual called the colonoscopy. When you don't have a colon, you can't really have a colonoscopy, but it's a similar test that's done and biopsies are taken. But because of what they learned in their due diligence, they amended his answer. They didn't supplement it, they amended it. And they amended his answer for him to sign when they delivered the policies in June. And their amended answer to the same question was, yes, I had a colon resection in 1984 due to colitis. My last colonoscopy was in 2004, with a sick in there because it was not really a colonoscopy. I have not had a colonoscopy since 2004, which is true, and I have had no gastrointestinal problems since that time. Gastrointestinal problems of colitis, as Penn Mutual knew in their investigation, are ongoing. They are constant. His doctor testified to that. His family all testified to that. Penn Mutual knew of that. So when they are talking about he had no other gastrointestinal problems since that time is what the answer really is. He didn't have any other gastrointestinal problems. But it doesn't say he didn't have any other gastrointestinal problems. Is it your position that Penn Mutual heard the response and they basically put the answer there? They did, Your Honor. There is no question about that. Four months later, they amended his answer and replaced it. And that's all stipulated to and agreed to. So this is their words describing his condition. And he signed off on it upon delivery. Everybody knew, and Penn Mutual knew about his colitis and what went along with that. So we believe that the court went out of its way, the magistrate judge went out of his way to avoid applying the jurisdictional law of the state of Ohio. Because in a diversity case, the substantive law is supposed to be applied from Ohio. Ohio has Ohio Revised Code 3911.06, which very clearly was adopted by the state legislature to give the benefit of doubt to the insured. And in this case, the burden of proof would have been on the insurance company to show that he knowingly, falsely made a misrepresentation willfully and fraudulently. And that it was a material misrepresentation that induced Penn Mutual to issue the policies. And that they had no knowledge about the condition of which he gave a lie about. That's what that revised code section requires. And it's been interpreted and applied in a very similar case to this one by the Jenkins Court versus Metropolitan Life in very similar situations in 1961. And it's still the landmark case that should have been applied by the court in interpreting what happened in this particular case. I mean, Mr. Deamer, this isn't really an adverse question to you. But that provision appears totally inequitable in this case under Ohio law. Because the statement at issue was, in fact – and correct me if I'm wrong – the statement at issue was incorporated into the policy. And in which case, under Ohio law, plus different cases, that provision doesn't apply. So I guess the question is, do you agree that the statement was incorporated into the policy? Your Honor, I do not believe that this was the certificate of good health which all the other cases relied upon by a magistrate judge is applying in this situation. I do believe that 3911 does apply and the Jenkins Court applies because his statement is a direct response to a question in an application. In the other cases involved by the magistrate in his written opinion, those were not cases where in which a question had been incorporated into an application and alleged to have been false. The application was incorporated into the policy, correct? Yes. Okay. Yes, there is a representations clause that says subject to the provisions of the insurance, all of the items set forth in Part 1 of the application are incorporated into the policy. And yes, so the answer is, but that doesn't take away otherwise what would be the purpose of 3911. Is 3911 exactly a sword that's being used against you here in your view? Is that a shield? Bless you, Your Honor. No, there's no question it is a shield. It's not a sword against us because there is no evidence of a willfully false statement. If anything, there's confusion as to the question about colitis and 2E and the question the way it was phrased. And then the amendment of that answer that Penn Mutual took upon themselves to do. They did that and so they're using now, they're not using 3911 because they have no evidence that he willfully or falsely made a material misstatement of the facts. How does the case of Avella v. Jackson National Insurance Company affect or apply to the facts you got in your case? Yes, Your Honor. I'm glad that you asked that question. That Avella decision was heavily relied upon by the magistrate judge and argued then later by Penn Mutual. They had a clause which put an affirmative duty in their policies on the policyholder or they insured an affirmative duty that does not exist in this Penn Mutual case. That affirmative duty says in the Avella policy, it says, quote, I understand that if my health or any of my answers or statements change prior to delivery of the policy, I must so inform the company in writing. In fact, there was an affirmative duty which does not exist in this case and the decedent in that case breached that duty and they did not follow up and give them subsequent required information. And the judge, magistrate judge, is applying that court as precedent for the decision in this case when in fact there was no affirmative duty. Mr. Ramsey never gave a negative answer. He never knew that he had something and didn't tell them about it. There's no evidence of that in the record. There's no one that can claim or show that he knew he had cancer and failed to tell them about it. Sure. One more question. When the operation of surgery was scheduled, is there a problem here about the obligation to the county under the county's policy to update it without additional information about that surgery in relation to that surgery? I understand your question, Your Honor, and it's a pertinent question. His appointment with this doctor, he had one in April and he had one in May before the policy was delivered. The doctor looked at him, examined him, and said he was perfectly capable and healthy to do this planned surgery. The planned surgery was to insert a sort of a sac. It's called a J-pouch. And this doctor invented it at the Cleveland Clinic. He had planned on and had used it all around the country. And he was recommending this to Mr. Ramsey to insert when the time was right. Mr. Ramsey had seen Dr. Lavery for his colonoscopy in 98, 2001, 2004 on a regular basis. He only missed the one time in 2007 and 8 because he was laid off. But then he immediately made follow-up appointments to get checked out. And getting checked out, the doctor says your symptoms are good, they are improving. This is in the record. Dr. Lavery says you're improving. But your life could be better and have less bowel movements and less problems if we insert this J-pouch. He didn't have a duty to come forward and tell them that he was going to do that. No more than if he said I have allergies and failed to come and tell them, by the way, my sinuses are congested on this day, this day, and that day. Or that I have arthritis, chronic arthritis, but I failed to tell them that my joints hurt this day, that day, and that day. He didn't have an affirmative duty to come to them and tell them about every single thing. In his mind, this was routine. In the doctor's mind, it was routine. This doctor had no clue about cancer and didn't know it until he opened him up to perform this surgery the end of June. Now coincidental or fortuitous, that may be. But the point is they made a contract. Once it's delivered, they're obligated. Had he had this issue or this surgery and learned of it before delivery of the policy in May, which could very well happen, Penn Mutual could have cut him out of the coverage at that time, but they didn't. And they didn't even inquire further of that either. Thank you. All right, thank you. Counsel, you may respond. Good morning, Your Honors. Good morning. May it please the Court, my name is Jeff Henson. I'm representing the appellee, Penn Mutual, and also appearing on behalf of Penn Mutual is Karen A. Davie. The appellee would like to respond to Mr. Deamer's presentation to the Court by focusing on the medical history of Mr. Ramsey. Because the medical history interplays with key policy provisions that are included in Part 1 of the application and Part 2 of the application. I mean, rather than to start going through the medical history, can you catch this in terms of a legal argument, some doctrine on the top of all, and how these medical events relate to that? Yes, Your Honor. I would like to do that, and I wanted to emphasize that the medical history, though, does include visits to Dr. Lavery between the time of the original application and the time of the policy. I mean, I'm just saying, just so we're clear about the medical history, I would like to catch it in terms of an argument rather than an actual legislation, so we don't want to do that. Good. Okay, thank you, Your Honor. There are two key provisions in the application for the insurance. There's Part 1 of the application, that's dated February 10th, 2010, and then there's Part 2 of the application, which is the medical history. Now, Part 1 of the application contains a provision which the magistrate judge determined to be a representation or a warning. The other provision that is key is the representation of Part 2 of the application, which is the medical history questionnaire. Now, I'm sure that Your Honors are familiar with Part 1 of the application. That has to be an agreement between the applicant for the insurance and the insurance company as to when the policy will come into effect. And that agreement states that no insurance will be enforced until the first premium is paid in full and the policy is delivered while the health, habits, occupation, and other facts relating to the proposed insurer are the same as described in this Part 1 of the application, any Part 2 required by the company, and any amendments or supplements to them. Part 2 of the application, same date, taken on the same, one after the other, Part 1 and Part 2, is the representation by the proposed insurer, the applicant, that the statements and the answers to Part 2 are written, as made by me, are full, complete, and true to the best of my knowledge and belief. It goes on to say that the applicant agrees that they will be part of the contract of insurance, which the court has already indicated, and that the applicant will be bound by such statements and answers and that Penn Mutual will rely on them, paraphrasing. So what did Penn Mutual have, as far as the medical history is concerned, when they received the application? Well, what they had was a representation by Mr. Ramsey that he had ulcerative colitis, that he had an intestinal resection, I believe is the way it's phrased in Part 2, in 1984, that he had a biopsy in 2006 of normal findings. So the disclosure of Part 2 of the application triggered an investigation by Penn Mutual regarding the ulcerative colitis. But there is a key provision of Question 2B that I must direct the Court's attention to, if you will indulge me, and that is, if you look at Question 2B, Question 2B doesn't ask only about ulcerative colitis. It also asks about intestinal bleeding. Intestinal bleeding may be a characteristic of colitis, but intestinal bleeding may be a characteristic of other diseases. So if it's a characteristic of colitis, he was disclosing colitis. Isn't there a genuine issue, at least, as to whether he breached some duty of his faith, or otherwise was not disclosing intestinal bleeding, and that could be substantive ulcerative colitis? Very good question, Your Honor. The common law duty goes back to the 1928 decision of the United States Supreme Court in the Stipzig case. The magistrate judge did not get to Stipzig because the magistrate judge felt that the language in Part 1 of the application that we just went over would get in the way of the question. So, I mean, my question is, disclosure of a larger than ulcerative colitis is potentially substantive disclosure of intestinal bleeding. Fair or not fair? Not complete, Your Honor, if I may. Because intestinal bleeding may be a characteristic of other conditions, including malignancy. But since he disclosed the colitis and executed a release of pin mutual to obtain all of the medical records, why wouldn't that be an issue to bring this? So then the broad parameters of disclosure, since the intestinal bleeding is, as Judge Pentley said, a characteristic of the ulcerative colitis. You only had a release to get all of the medical records. Well, there is an issue with regard to the medical records, Your Honor, that were available. What's the issue? Well, all that mutual had after the investigation were two pathology reports. One from 2001 and another from 2004. But the release didn't limit you to those two things, did it? I beg your pardon? The release did not limit you to those two records, did it? Oh, no, of course not, Your Honor. You're absolutely correct. What pin mutual did is that they sent a vendor out to get medical records from the physicians and from the facilities. And when pin mutual sent their people out to obtain all of Mr. Ramsey's medical records from the Cleveland Clinic, they got nothing. And they were told by the librarian at the Cleveland Clinic that there were no records available for this patient. What does that have to do with whether the clinic can cover the policy? I mean, this is like, you know, pin mutual's investigation is pin mutual's investigation. They deal with entities like Cleveland Clinic all the time. Why is that Mr. Ramsey's problem? Your Honor, again, it's a very good question in this case. When pin mutual received those two pathology reports and no other medical records, they wanted the assurance of Mr. Ramsey that he had no gastrointestinal problems since the last pathology report, which was in 2004. So, yes, did pin mutual prepare the language of the application amendments? Certainly. That's exactly what they did. But they wanted Mr. Ramsey to assure them that there were no gastrointestinal problems going back to the last time he saw Dr. Lavery in 2004 because there were no medical records available for them to review of any medical history going back six years before the application. Well, again, let's convert this to a discussion about provisions of the contract or legal documents under which, and as I kind of understand what you're saying, it seems like you're going towards a condition precedent argument perhaps? Yes, Your Honor. From your representation. Yes, Your Honor. And I just want to be candid with you about my concerns. Ohio law seems to be clear that, quote, an assurance that is stated fast, which parties supposed to then exist, remains true. That's from Ohio National Life Insurance. Assurance versus statutory only insurance is not a condition precedent under the power law. That seems like precisely what we have with respect to the language in the policy saying the contract doesn't come into place unless its health has not changed. What do you say to that? Your Honor, that is a very interesting question about the development of Ohio law. I mean, we have to apply a model. Absolutely. It's a diversity case. The substantive law of the state of Ohio applies. Although, as Your Honor pointed out, there is a Sixth Circuit decision, the Avella case, that does hold these provisions to be a condition precedent. But I do want to comment about Satterfield. Satterfield was a case that involved a different issue. It had to do with whether or not an insurance company could contest a policy after the contestable period had run. And so what the court did, the appellate court, and I believe Akron did, was to take a look at this language that Your Honor has pointed out, and then review Ohio law with the Moomaw decision, the Moomaw against Western and Southern Life. And with all due respect to the Satterfield court, it's our position that the Moomaw case is dated. Because Moomaw was not a case that was decided where a written application was involved. It was a sound health provision that was just basically part of the policy when the policy was delivered. The case that we have here involves a written application. The Langley case out of Columbus involves a similar provision that was characterized by the Franklin County Court of Appeals as a condition precedent. The Avella court characterized this as a condition precedent. Drake v. John Hancock Life Insurance Company is a 1975 decision. Actually, I was counseled for John Hancock in that case. It does go back a ways, but it does recognize that our New England court didn't seem to have any analysis to its condition precedent. And Moomaw is a Supreme Court of Ohio case. It is. So, I mean, isn't that game over on this particular argument as far as what we have to do? Well, respectfully, Your Honor, we do not believe there is. Because in Drake v. John Hancock, the Ohio Supreme Court in 1970, I'm going to say 1975, which is 50 years after Moomaw, reviewed provisions of an application that had to do with when an insurance policy would take effect. And every one of these cases is going to be different. Every company has a different language, even within their own policies they have to comply with. But the point is that the Ohio Supreme Court recognized in Greg that contractual conditions precedent, Your Honor, are made. Contractual conditions precedent that are contained within an application for insurance, which is nothing more than an offer to purchase insurance from the insurance company, are valid contractual conditions precedent to the policies taking effect. And Moomaw doesn't address that issue at all. And Satterfield overlooked it because the application in Satterfield had a contractual condition precedent, just like the application does in this case, Your Honor, in respect to Satterfield. So I have to disagree respectfully that Moomaw is dispositive of the case. And as I pointed out in the appellant's brief, Satterfield is questionable authority on that issue. Well, that sounds like a difficult and fortuitous path for your argument, you know, under Ohio law. Well, the only reason I can say, again, you know, I was counseling for John Hancock in my case. And to me, when I see this language in these applications, to me, if the industry understands it as a conditional precedent, I've always understood it as a conditional precedent. And then when the Satterfield case looked back at Moomaw, it sort of threw me for a back-over-the-loop on it because I didn't understand what the Moomaw case was saying. But, again, respectfully, it's a legal decision. Well, you certainly know you're in Ohio insurance law. Well, thank you very much, Your Honor. I appreciate that. But the other thing about representation, it also appears in your Ohio law that representations render a false representation renders a policy avoidable. A misrepresentation in a warranty makes it avoidable, is my understanding. Like this James case, James versus, actually, yeah, James versus Safe, a lot of fortuitous investment. I'm struggling with it. That's okay. This is not a moral question. But, you know, I think that distinction is one that is contrary to common law. Here's my concern. The policy itself says it's a representation policy. And, personally, I'm not sure it would be contrary to the U.S. insurance context. Of course not. So aren't we obligated to take these as representations, which means it's avoidable, which means you have to throw a flag before a claim is made in order to invalidate it? I'm sorry. I don't know what else to add. You have to throw a red flag on what? My understanding is that for avoidable policy, the insurer has to raise the, has to avoid it before a claim is made. You can't invoke avoidable ground. You can't take policies for 20 years and then wait for them to make a claim and then say, aha, well, you know, it's avoidable because you said this thing 20 years ago. You have to avoid it. Now I understand your question. Thank you very much. Stop. What? I only have 15 seconds left. That's what I, you know better than I do. I want you to help me if I'm wrong. Well, thank you, Your Honor. I appreciate the compliment. I think what the court is getting at here is the effect of the incontestability clause. There's a two-year incontestability clause that is included in this life insurance policy. And it's probably required actually by statute as a statutory provision in Ohio that every policy of life insurance has a two-year incontestability provision. That means if a person – if a policy is issued and after two years the policy is incontestable. But. But. I'm sorry. For the James case versus Safeco and there's another case, Boggs. I'm sorry. Let's stop here. Allstate versus Boggs. Ohio 1971. In those cases, you're going to say that once a claim is made under a policy, the insurer cannot then avoid it. Boggs is not a life insurance case. Okay. How about the Safeco case? I don't know Safeco, but I do have authority in the court that I can't respond to this. That's what the incontestability clause says. But there is a – there's another case that is well-known in Ohio life insurance law that is the – is another John Hancock case. It's Ginley versus John Hancock. And what Ginley says is – what Ginley does basically is that it applies the rule that is pretty much a national – I would say it's a national rule in just about every state. That if an insurer takes out a life insurance policy and the insurer passes away in that two-year incontestable period, then that two-year incontestable period is told. And what Ginley stated was that if the time period is told, then the insurance company may raise any offense to a claim under policy even after – even if it's after two years. So what happened in this particular case is that Mr. Ramsey died from cancer in 2011, which was within the two-year contestable period. Magistrate Judge William Bauchman noted the Ginley case in his opinion and commented that the incontestability period is not a bar in this case. I know you're out of time, but I guess the cancer was not discovered until the surgery of June 24, 2010. And if the medical treatment and plans for the surgery prior to that date was just routine – I shouldn't say routine because it was major surgery – but it was just maintenance of pre-existing conditions and treatment of pre-existing conditions that the insurance company already knew about, is this a situation that can be resolved on summary judgment? Well, Your Honor, that's a very good question because this is an appeal from the Magistrate Judge Branton and mutual summary judgment, so that definitely is a fair question. To answer your question, again, I apologize to this to some extent, but the reason that Mr. Ramsey went to see Dr. Lavery in April and May of 2010 was because he was having issues. That's documented in the Cleveland Clinic records. He was the one who initiated the call. The claims he announced would be that he periodically required treatment anyway and that that's a chronic, ongoing condition, so the insurance company knew about that. And every few years he went back, and this time your adversary would say he was prescribed some surgery, not because he had cancer, but to improve his quality of life and that cancer wasn't discovered until the actual surgery on June 24. If all that's true, and I know it's disputed, why would summary judgment be appropriate? Well, Your Honor, there's a big difference between the type of maintenance that the appellant suggests here and what Mr. Ramsey was going through. There was no evidence at all in any of the medical records that Mr. Ramsey was experiencing intestinal bleeding. The first evidence of that coming up, Your Honor, if I may, was in November of 2009, which was just a month and a half, two months before he applied for the insurance. When he went to see Dr. Lavery in April, it was April 28, 2010, Your Honor, his complaints were, if I may, fairly graphic as bloody follow-ups, bloody PMs. He had never taken, he had been, Dr. Lavery had suggested... Let me ask you something on that point. Is that because the lab tests showed blood in his stool, or was it that there was visible blood when he had a bowel movement? I didn't think it would be so graphic. Yes, it is graphic. Well, what did the medical records show in that regard? Complaints of visible bloody PMs in the toilet documented by Cleveland Clinic records indicating the complaints that the patient was presenting at the time he was seen by Dr. Lavery. This is new. This is what Magistrate Judge Bachman said was new. That this was a big difference between what was happening before. There was no, Your Honor, if I may... It was good to hear what you had to say. Thank you, Your Honor. I appreciate that very much. I do. The pathology reports that Penn Mutual had had no indication that there was any intestinal bleeding at all. There is no evidence in any of the medical records that there was intestinal bleeding. When he gets to Dr. Lavery in April of 2010, he's reporting that he's got bloody PMs visible in the toilet. He's having 15 or more bowel movements per day. Dr. Lavery prescribes a steroid, a very strong medication to stop his bleeding. It didn't work. He went back to see him in May of 2010. The steroids had a little bit of a help. But then the next thing, as has been pointed out, is that he was scheduled for surgery on June 24th because his medications were not helping him. And the surgery was not a cosmetic type of surgery. Dr. Lavery removed this man's corrective. You know, it's interesting that the insurance company, your medical records, didn't see fit to order the medical examination of the plaintiffs to see them in the process of deciding on this policy, which, of course, you could have. Well, Your Honor, I can't comment on Penn Mutual's practices and policies. All I can tell you is from my experience in the business, it did not work. But in this case, Mr. Ramsey reported a chronic condition. He described that condition, and I know you'd say he didn't fully describe it. But based on Penn Mutual's examination, they did rate him a higher risk because of that chronic colitis. And all of the symptoms that he had ultimately were things that were part and parcel of this ulcerative colitis, correct? Your Honor, that's an excellent question. I was actually thinking about that question last night when I was preparing for this argument. What Penn Mutual did here, as far as underwriting, is to underwrite him for colitis. If he had disclosed in response to the question, Part 2 of the application, or had made the disclosure with the application methods that he signed later on, that he was having intestinal bleeding, he had a completely different underwriting scenario. They did not underwrite him for intestinal bleeding. They underwrote him for ulcerative colitis. Now, Mr. Benson, this was not explored for a surgery that Mr. Ramsey underwent. There wasn't a need to find out what was going on there. And certainly, that is a matter of quality. I don't think Dr. Mooney retestified that, Your Honor. I mean, again, the distinction you're making that we underwrote colitis but we didn't underwrite intestinal bleeding, well, at least as far as we're looking at the record, it would appear that Dr. Lavery was among those fooled by whether this was simply a symptom of colitis or a symptom of cancer. I mean, as I understand the record, he's saying he goes in there to do one surgery and sees cancer, which he didn't expect to find, and has to stop. So he thought that the bleeding was just colitis, not cancer. So what are we judging? Why isn't that a better characterization? Well, with due respect, Your Honor, I can't ask, I can't speak for Dr. Lavery. I don't know why he was excluded. I'm not asking you to speak on that. I'm asking you to speak on the record. The record before us shows, I think, requires us, doesn't it, to think that, you know, that Dr. Lavery did no better, and Apol Shororai, why would we impute the clinic himself with knowledge that this bleeding was something other than colitis that he had experienced for decades? Because there's no evidence in the record, Your Honor, that he ever had intestinal bleeding before. Well, that's supposed to be a characteristic of colitis. As best I understand, he was mistaken in that. Your Honor, we're not disputing that it's a characteristic of colitis at all. The point, however, is that, again, looking at both of the applications, the Part 2 that was signed February 10th, and then the application amendment later on, made no disclosure at all that he even had intestinal bleeding in the first place. In the application that was dated June 1st, the application amendments, he is making a representation to the company that he has had no gastrointestinal problems since 2004. It's unambiguous. And, in fact, he's going to see Dr. Lavery because he has complaints of a serious condition. Okay, one question more, and then I'll stop. Given everything that's been said by you and the questions, and at summary judgment, we're supposed to take all inferences in favor of the Ramsey estate. Even what the record demonstrates about the knowledge by Ken Mutual of colitis, Dr. Lavery, and all that, why doesn't this pose, in your mind, a situation where there are material questions which would make summary judgment inappropriate? That's getting back to Judge Clay's question. Given the record that we have and what's been disclosed here, why is this a case that's appropriate for summary judgment? Your Honor, I think the response to that question is actually a reference back to the Abella decision decided by the Sixth Circuit Court of Appeals in 1998, where there was a similar situation where there was a failure to disclose. And in that particular case, the Sixth Circuit stated, as to whether Dr. Abella committed a material breach of a condition precedent by failing to inform the insurance company of changes in his answers to the questions in the insurance application, quite a different situation is presented. Based upon day-no-go review of all pertinent facts as to which there is no genuine issue, we conclude that Dr. Abella did commit such a breach. But your insurance policy didn't have those specific requirements for specific updating as the policy referred to. And so, given the rules of construction, we have to, of course, construe your policy against him if it fails to specifically request certain things. Well, that's true, Your Honor, and that's a very good point. In Abella, there may have been that provision in there, whereas this policy doesn't particularly have that specific language in it. I mean, that's evident on the face of the papers. However, this gets back to the question of the failure of the condition precedent itself and the effect of that provision to which the court should give force and effect as part of the contract. Counselor, I think we have your position in hands. Thank you, Your Honors. I think we should move to rebuttal. Thank you very much. Thank you for taking the time to know the case and to ask the pertinent questions that you did about it. Much appreciated. Thank you very much. Please, the court, my distinguished opposing counsel, doesn't want to comment on the policies and procedures of Penn Mutual, but I would enjoy that opportunity to do that because they had no medical director during this entire time period. Despite their table rating of John Ramsey and increasing his premiums to double, they did so with a letter that said, based on the medical director's review of your history, there was no medical director, as the record will show. They had lost their medical director, but they still used his letterhead, and staffers in Penn Mutual's headquarters wrote those letters on his letterhead and committed, I think, a fraud upon the policy owners and the applicants for that. Nonetheless, the point in our particular situation is, he says the bleeding was new. Penn Mutual has a very serious underwriting guideline book. Very clear. Staffers all knew of it. Medical directors wrote it. They used this to evaluate how much they're going to charge people for life insurance. It's a matter of the record, document number 66, joint exhibit number F, the substandard table rating. Those guidelines describe chronic ulcerative colitis as, quote, an inflammatory disease of the mucosa of the large bowel characterized by attacks of bloody diarrhea punctuated by periods of remission. They want to say that the presenting signs and symptoms of ulcerative colitis, rectal bleeding, diarrhea, cramping, abdominal pain, anorexia, and weight loss, bloody diarrhea and abdominal pain are characteristic symptoms repeated. So they knew this. This was nothing new. His history was this. His mother testified. His wife testified. These were constant things in his life. He didn't brag about it or talk about it or go into detail, but they saw his underwear, they saw his sheets. This was his life since 1984, and that's what he and his wife lived with. He didn't think he had anything more than just ulcerative colitis, and he was dealing with that, and there's no evidence in the record that it ever went into remission. It was not in remission between 2004 and 2010. It was something that was there. And his surgery, as Dr. Lathway described in his deposition, was not exploratory. It's uncontested, pure fact. It was not exploratory, and he didn't consider it major surgery. He considered it routine. It wasn't a deep cut. It was just superficial to go in and attach this pouch and try and move things around in there to make it a better quality of life for him. And Justice Keeflage, I wanted to mention your point. We had your question in mind when we wrote our brief as well, that the representations did incorporate the application. But we think 3911 still applies because it says a false statement in the application or a false statement in any application for insurance and the conditions under which that false statement has to be proven and the burden of proof on the insurance company to do that. So, yes, the representations clause incorporates into the policy the application questions and the answers. But we believe there was no fraud. There was nothing different in his answer. Well, we have a Lumpkin v. Metro Life Insurance case that says this section doesn't apply but the stipulation under which the insurer applies is in the policy. So it just seems to be decided. But then that could overrule Jenkins then, and I don't know that that court had the authority to do that. The Moomaw Court, as you pointed out... The Moomaw Court decision, 1917, again, it said condition precedent was not applicable in that case, and again, that's water under the bridge because it did say that if you meet all the terms once the policy is issued, there's a contract in place, and it may be voidable, but then you have to prove a false statement, and we don't think that they've done that. Same thing with Gregg, Your Honor. That case had to do with an agent misrepresenting something or waiving a condition precedent and proceeding, and that never occurred in this case. We're not alleging that wasn't part of our case. As far as summary judgment, we believe the summary judgment certainly shouldn't have been granted. There's some great questions of fact from their point of view. From the appellant, Barbara Ramsey's point of view, we believe summary judgment should be granted for her because under the Jenkins case in 39-1106 and the Perkins case I cite on page 25 of our appellant's brief, it's pretty clear there's no question of fact. After all the evidence, they took their family computer and did a forensic study of their family's kitchen table computer that the kids used to see in the years prior if they'd done any research on cancer, colon cancer. They found nothing. That's how in-depth they went. They deposed grandmas and sisters and brothers and friends. They deposed all these people. Found nothing that would show that this man knew that he had cancer. And as a result, we feel summary judgment should have been granted on the liability of the company to honor the policy that they wrote and took premiums for. And with that, I close and thank you. Let me ask you one more thing. When did the policy become effective? Is there a delivery date that it became effective? Or what would be the date for that? June 1, 2010. Premiums were started before that, but they actually delivered the amended policy, and they'd gone back and forth for months after researching his background and history. When they changed the premiums, then John Ramsey could not afford what the raised premiums were for the amount that he was going to get, so they reduced the amounts with the help of the Penn Mutual agent. They reduced it to almost half whole life for future insurance. Okay, I think I've answered your question. Thank you. Thank you very much, and in case you submit it. I appreciate your arguments. Thank you. When the clerk is ready, you can call the next case. Thank you, Your Honor.